**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| CURT A. MARCANTEL, | **MEMORANDUM DECISION & ORDER** |
| Plaintiff, | |
| vs. | Civil No. 2:16-cv-250-DBP |
| MICHAEL AND SONJA SALTMAN FAMILY TRUST, MICHAEL A. SALTMAN and SONJA SALTMAN, | Magistrate Judge Dustin B. Pead |
| Defendants. | |

This matter comes before the court on Plaintiff Curt A. Marcantel ("Mr. Marcantel") and Defendants Michael and Sonja Saltman Family Trust, Michael A. Saltman and Sonja Saltman's (collectively the "Trust") cross motions for summary judgment.[1] The parties consented to United States Magistrate Judge Dustin B. Pead conducting all proceedings, including entry of final judgment.[2] On February 25, 2019, the court held oral argument on the cross motions.[3] The court, having carefully considered the parties' submissions, relevant legal authorities and oral argument of counsel, grants the Trust's motion for summary judgment and denies Mr. Marcantel's cross motion for partial summary judgment.

---

[1] ECF No. 105, ECF No. 109.
[2] ECF No. 14, ECF No. 16; *see* 28 U.S.C. § 636(c), Fed. R. Civ. P. 73.
[3] Mr. Marcantel objected to the Trust's proposed memorandum decision. *See* ECF No. 130. The court has considered the parties' objection and response and therefore determines the Trust's proposed memorandum decision accurately reflects the decision of the court.

## SUMMARY OF UNDISPUTED FACTS[4]

A document titled "Grant of Easement" naming Verna Thorn as Grantor and the

Snyderville Basin Sewer Improvement District as Grantee was recorded with the Summit County

Recorder's Office in May 1989 (the "Sewer Easement").[5]  In early 2007, the Trust purchased the

subject property located at 1064 Park Avenue (the "Property") for $1,700,000.  During the

Trust's purchase of the Property, the prior owner, Old Town Partners, LLC ("OTP"), disclosed

that the Property was encumbered by the Sewer Easement.  While the Property was under

contract to be sold to the Trust, OTP commissioned an existing conditions survey showing the

Sewer Easement (the "Survey").

---

[4] The following facts are taken from the Trust's motion, ECF No. 105, and Mr. Marcantel's motion, ECF No. 109.  During oral argument, the parties' represented the facts as stated herein were undisputed.  Furthermore, these facts are generally undisputed based on Mr. Marcantel's admissions. The court's consideration of the facts Mr. Marcantel purports to dispute, viewed in a light most favorable to Mr. Marcantel, reveals either no admissible evidence to dispute those facts or the dispute is not material.  *See* Fed. R. Civ. P. 56(e)(2) ("If a party... fails to properly address another party's assertion of fact as required by Rule 56(c), the court may... consider the fact undisputed for purposes of the motion [.]").
[5] ECF No. 105-2.



However, there is no evidence showing the Survey was provided to the Trust. Instead, the evidence supports the Survey was sent to Elliott Workgroup Architects ("EWA"), an architectural firm that was working with OTP's (and then the Trust) to create design concepts for the Property. For Mr. Saltman's transaction, the Sewer Easement was not identified as an encumbrance of record or exception to coverage in the Trust's title insurance policy on the Property.

After purchasing the Property, the Saltmans worked with EWA to design concepts for a three-lot subdivision on the Property, a single-family home to be constructed on each lot. EWA used the Survey in creating its design concepts. The Trust, in 2007, submitted several pre-development applications to the Park City Planning Department for the three-lot subdivision and the concepts designed by EWA. The applications to Park City included the Survey and the

Trust's title policy. The Saltmans also submitted an application to the sewer district to relocate the Sewer Easement, signed by Mr. Saltman on behalf of the Trust.

The three-lot subdivision proposed in the applications was not feasible without relocating the Sewer Easement from its existing location (running through the center of the proposed third lot) to the perimeter of the Property:



The files of the Park City Planning Department identify that the Trust's applications for the proposed three-lot subdivision and pre-development approval for three homes were closed on October 1, 2007.[6] However, the Trust's application to determine that the existing structure on the Property was "non-historic" was approved, and the building was subsequently demolished, leaving the Property a vacant lot. At no time did the Trust relocate the Sewer Easement. Furthermore, the Trust contends it stopped the pre-development process in 2007 because the real estate market crashed, making any development unfeasible.

Between 2010 and 2014, EWA created at least three alternate concepts for the Trust that would not require relocating the Sewer Easement. The Sewer Easement is illustrated on each concept.[7] One concept proposed subdividing the Property into two lots, with a duplex on one lot and a home and accessory apartment on the other. EWA's architect advised the Saltmans that

---

[6] ECF No. 109-8.
[7] ECF No. 105, pp. 4-6, ECF No. 109.

4

density higher than two units on a lot was not "feasible" without a code change and was penalized under the code with requirements for 60% open space and due to height restrictions.[8] The other designs were for either four or five multi-dwelling units (townhouses or condos) on the Property as a single lot. The designs did not comply with various provisions of the development code, including open space.[9] The Trust did not submit pre-development applications to Park City for any of these alternate concepts.

In or around early 2015, the Trust listed the Property for sale. The MLS listing for the Property stated, in part: "Most development opportunities in old town come with major constraints, but this parcel is vacant and ready for your ideas… at 6900 SF this parcel may be able to accommodate up to 5 residential units."

The Trust and Lakeland Homes, Inc. entered a form Real Estate Purchase Contract ("REPC") on February 2, 2015. Paragraph 7 of the REPC provides that the seller would provide "a written Seller Property Condition Disclosure (Land) for the Property, completed, signed and dated by Seller"; a commitment for title insurance; and the term inserted by the buyer a "Survey, if one has been done," amongst other disclosure items. Furthermore, in Paragraph 10.2 the Trust agreed to: "(a) disclose in writing to Buyer defects in the Property known to Seller that materially affect the value of the Property that cannot be discovered by a reasonable inspection by an ordinary prudent Buyer; (b) carefully review, complete, and provide to Buyer a written Seller Property Condition Disclosure (Land) … The provisions of Section 10.1 and 10.2 shall survive Closing."

Mr. Saltman, on behalf of the Trust, completed the Seller's Property Condition Disclosure (Land) form ("Seller's Disclosures") on or around February 8, 2015. The Seller's Disclosures provide the following instructions:

---

[8] ECF No. 109-10, Ex. 25-001.
[9] ECF No. 109-9, Ex. 25-004.

**INSTRUCTIONS TO SELLER**

SELLER IS OBLIGATED UNDER LAW TO DISCLOSE TO BUYERS DEFECTS IN THE PROPERTY KNOWN TO SELLER THAT MATERIALLY AND ADVERSELY AFFECT THE VALUE OF THE PROPERTY THAT CANNOT BE DISCOVERED BY A REASONABLE INSPECTION BY AN ORDINARY PRUDENT BUYER. This disclosure form is designed to assist Seller in complying with these disclosure requirements. Please thoroughly disclose your actual knowledge regarding the condition of the Property. The Company, other real estate agents, and buyers will rely on this disclosure form.

- Complete the remainder of this form.
- Please be specific when describing any past or present issues or defects (location, nature of problem, etc.). Use additional addendum if necessary.
- If a question does not apply to your Property, WRITE "N/A" NEXT TO THE QUESTION.

Further, Section 6 of the Seller's Disclosure, paragraph D, required a "yes" or "no" response to the following question: "Are you aware of any survey(s) that have been prepared for the Property or any adjoining property or properties? If 'Yes,' please provide a copy of any such survey(s) in your possession." The Trust checked the box for the response "No." Paragraph E of Section 6 required a "yes" or "no" response, and provides a space for the seller to insert additional responsive information, to the following question: "Are you aware of any unrecorded easements, or claims for easements, affecting the Property? If 'Yes,' please describe, to your knowledge, the nature and location of any such easement(s)." The Trust checked the box for the response "No." Even though the Trust had actual knowledge of the Sewer Easement, the Trust did not disclose it in response to instructions or any questions contained in the Seller's Disclosures.

According to Mr. Marcantel, he had no specific plans to develop the property at the time of the purchase. However, Mr. Marcantel's realtors had seen the 2007 EWA site plan subdividing the Property into three lots. And they saw a Multiple Listing Service ("MLS") listing suggesting the Property "may be able to accommodate up to 5 residential units." Furthermore, Mr. Marcantel's realtors also met with the Park City Planning Department to discuss potential development options. Mr. Marcantel's realtors relayed this information to him, though Mr.

Marcantel did "not necessarily" believe what his realtors told him or rely on their representations.

Further, the Trust's agent, Matt Magnotta, and Marcantel's agent, Tisha Digman, discussed the Property over the phone. Magnotta told Digman that he believed that three single-family homes could be built on the Property. Magnotta forwarded Digman an email with a Dropbox link. The link included some of the design materials from the Trust's proposed three-lot subdivision application submitted to Park City in 2007. The materials included illustrated three homes and their placement on the Property pursuant to the application for the three-lot subdivision submitted to the City back in October 2007. It is undisputed that the link provided to Digman did not include the Survey or the proposed subdivision plat depicting the location of the Sewer Easement.

Mr. Marcantel commissioned a title search through Coalition Title and Stewart Title. After conducting the search, Coalition Title and Stewart Title represented to Mr. Marcantel that there was no sewer easement on the Property, and issued a Title Insurance Policy in favor of Mr. Marcantel for the Property ("the Policy") insuring Mr. Marcantel for up to $1,775,000 in loss related to any undiscovered encumbrance. Relying on the Policy and prior to closing, the REPC was assigned from Lakeland Homes, Inc., to Mr. Marcantel. Thereafter, Marcantel closed on the purchase of the Property for $1,775,000 without knowing his title insurance policy did not identify the Sewer Easement.

At that time, Mr. Marcantel/Lakeland apparently had no actual knowledge of the Sewer Easement. Mr. Marcantel—an experienced, sophisticated real estate investor who owns four or five homes in Louisiana, cattle ranches in Texas and Louisianna, and homes in Park City and Salt Lake—was purchasing the Property as an investment.

Approximately six months later, Marcantel entered a contract to sell the Property to Joe Kelly for $1,995,000. While under contract, Kelly and his agent discovered the Sewer

Easement. The Sewer Easement was not identified in the title commitment issued by U.S. Title for Kelly's intended purchase. Kelly's agent obtained a copy of the Survey from EWA, confirming the location of the Sewer Easement. Kelly cancelled the contract. Kelly offered reduced amounts to purchase the Property, up to $1,400,000, but Mr. Marcantel rejected the offers.

Mr. Marcantel sold the Property in March 2018 for $1,450,000. Mr. Marcantel's expert appraiser values Marcantel's damages due to the discovery of the Sewer Easement at $450,000. The Saltmans' expert appraiser values that the difference between the Property as encumbered and unencumbered by the Sewer Easement resulting in a loss of $65,000. Further, Marcantel submitted a claim under the Policy, and Stewart Title accepted the claim, eventually paying Mr. Marcantel $272,500 to settle the claim.

## STANDARD OF REVIEW

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *McGeshick v. Prinicipi*, 357 F.3d 1146, 1149 (10th Cir. 2004). One of the principal purposes of summary judgment is to identify and dispose of factually unsupported claims. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Thus, summary judgment is appropriate where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id*. at 322. Once the moving party has demonstrated the absence of material fact disputes, the burden shifts to the non-moving party to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." *Id*. at 324; *see also Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). To meet this burden, the nonmoving party must come forward with admissible evidence. Fed. R. Civ. P. 56(c); *Alder*, 144 F.3d at 671.

The Court views the evidence "through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, (1986)). Thus, on his fraud-based claims, Mr. Marcantel's substantive burden is to show evidence in the record that clearly and convincingly establishes each element of the claims. *See Giusti v. Sterling Wentworth Corp.*, 2009 UT 2, ¶ 62, 201 P.3d 966 ("Summary judgment is warranted if a plaintiff fails to supply evidence, which, if accepted as true, would clearly and convincingly support each element of a fraud claim.") (internal quotation marks omitted).

## ANALYSIS

Mr. Marcantel has asserted four claims against the Trust: fraudulent nondisclosure, fraud, breach of contract, and breach of the covenant of good faith and fair dealing. As explained below, Mr. Marcantel has not met his burden on any of these claims.

### I. The Trust is entitled to judgment on Mr. Marcantel's nondisclosure and fraud claims.

Mr. Marcantel first asserts claims for fraudulent nondisclosure and misrepresentation. The Trust argues Mr. Marcantel is not the real party in interest for either of these claims and, in any event, they fail on the merits. Mr. Marcantel argues that he is the proper plaintiff because he, and not Lakeland, was damaged as a result of reliance on the Trust's representations. In addition, Mr. Marcantel counters the Trust's arguments on the merits and seeks summary judgment on his fraudulent nondisclosure claim.

### A. Mr. Marcantel is the real party in interest on his fraudulent nondisclosure or fraudulent misrepresentation claims.

Lakeland assigned the REPC to Mr. Marcantel on March 12, 2015.[10] Under Utah law, that assignment included the right to sue for fraud and fraudulent nondisclosure. *See Russell/Packard Dev., Inc. v. Carson*, 2003 UT App 316, ¶ 31, 78 P.3d 616, *aff'd sub nom. Russell Packard Dev., Inc. v. Carson*, 2005 UT 14, ¶ 31, 108 P.3d 741 (*citing Mayer v. Rankin,* 91 Utah 193, 63 P.2d

---

[10] ECF No. 109, Ex. 41.

611 (1936)). Accordingly, the "person entitled under the substantive law to enforce [their] right[s]" is Mr. Marcantel not Lakewood, *U.S. ex rel. Eisenstein v. City of New York, New York*, 556 U.S. 928, 935 (2009) (quoting *Black's Law Dictionary* 1154 (8th ed. 2004)), and Mr. Marcantel is real party in interest. Fed R. Civ. P. 17(a).

## B. Mr. Marcantel's nondisclosure claim fails on the merits.

The thrust of the nondisclosure claim is that the Trust fraudulenly failed to disclose the sewer easement.[11] To succeed on this claim, Mr. Marcantel must demonstrate by "clear and convincing evidence" that: (1) the Trust "had a legal *duty* to communicate information"; (2) the Trust "*knew* of the information [it] failed to disclose"; and (3) "the nondisclosed information was *material.*" *Hess v. Canberra Dev. Co.,* 2011 UT 22, ¶ 29, 254 P.3d 161 (emphasis in original). Mr. Marcantel must also show clear and convincing proof of intent to deceive. *See Anderson v. Kriser*, 2011 UT 66, ¶ 26, 266 P.3d 819. As explained below, this claim fails on the merits because the Trust did not know Mr. Marcantel was unaware of the easement, and in any event, Mr. Marcantel already had constructive knowledge of the easement.

### 1. The fact that the Trust did not know Mr. Marcantel was unaware of the easement effectively precludes proof on two elements: duty to disclose and intent to deceive.

Mr. Marcantel must demonstrate both a duty to disclose and intent to deceive. It is undisputed, however, that the Trust did not know Mr. Marcantel was unaware of the easement. This alone negates any duty to disclose or intent to deceive on the part of the Trust.

#### a. Duty to Disclose

A failure to disclose may be actionable as fraudulent nondisclosure only where the defendant has a duty to disclose. *See Hess,* 2011 UT 22, ¶ 29. The question, then, is how that duty arises. The Restatement (Second) of Torts—cited as authoritative by the Utah Supreme Court in

---

[11] ECF No. 109, Plaintiff's Motion for Partial Summary Judgment, at 31; ECF No. 89, Third Amended Complaint & Jury Demand, at ¶ 133.

*Mitchell v. Christensen*, 2001 UT 80, 31 P.3d 572—answers the question this way: a duty to disclose a defect exists where "A knows that B is not aware of [the defect], that he could not discover it by an ordinary inspection, and that he would not make the purchase if he knew it." Restatement (Second) of Torts § 551 cmt. l, illus. 9 (1977).[12] Indeed, "a disclosure duty ripens only when it becomes apparent to the non-disclosing party that another party is operating under a mistaken perception of a material fact." *Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.*, 68 F.3d 1478, 1484 (2d Cir. 1995) (citing Restatement (Second) of Torts § 551 cmt. k (1977) (no liability for nondisclosure where defendant has no reason to believe plaintiff is acting under a misapprehension)). In other words, the "speaker must actually know that the other person is about to enter into the business transaction under a mistaken impression of basic facts and that the other would reasonably expect disclosure of the truth in order to correct the erroneous impression." Patrick J. McNulty & Daniel J. Hanson, *Liability for Aiding and Abetting by Silence or Inaction: An Unfounded Doctrine*, 29 Tort & Ins. L.J. 14, 36 (1993); *see also Gresh v. Waste Servs. of Am., Inc.*, 311 F. App'x 766, 772 (6th Cir. 2009) (describing it as a "superior-knowledge duty of disclosure….").

The purpose of the disclosure duty, then, is to stop one party from intentionally taking advantage of the ignorance of the other. This presupposes knowledge that the other party is acting in ignorance of the undisclosed matter. For that reason, where "the defendant has no reason to think that the plaintiff is acting under a misapprehension, there is no obligation to give aid to a bargaining antagonist by disclosing what the defendant has himself discovered." *Id*.

---

[12] *See Mitchell v. Christensen*, 2001 UT 80, ¶ 12, 31 P.3d 572. Mr. Marcantel argues that the "buyer in *Mitchell* was not required to prove that the seller knew that the buyer had not discovered the leaks in the swimming pool…."[12] Actually, the *Mitchell* decision is silent on the matter. The seller may have conceded the point given the nature of the defect—an underground leak. Or the issue may have been resolved at the trial court level and never raised on appeal. In any event, the absence of analysis on the issue in *Mitchell* tells this court nothing.

In this case, the Trust had no reason to think that Mr. Marcantel was unaware of the easement. Mr. Marcantel has not met his burden of establishing by clear and convincing evidence that the Trust knew he was "acting under a misapprehension" concerning the easement, and as such, he has failed to establish that the Trust had a duty of disclosure.

**b. Intent to Deceive**

Even if Mr. Marcantel could establish the Trust had a duty of disclosure, his fraudulent nondisclosure claim would still fail because he cannot establish another element of that claim— that the Trust had an intent to deceive. Indeed, "intent is the hallmark of an intentional tort" and the intentional tort of fraudulent nondisclosure, like any fraud claim, requires proof by clear and convincing evidence of the defendant's intent to deceive. *Anderson*, 2011 UT 66, ¶ 26. Because the Trust did not know or have reason to believe that Mr. Marcantel was unaware of the easement, it could not, as a matter of law, have intended to deceive him on that point.

Nonetheless, Mr. Marcantel argues that intent to deceive may be inferred in this case by showing "that [the Trust] had actual knowledge of a material fact" and failed to disclose that fact. *Id.* This may be true in certain cases, but in this case, that the Trust knew of the easement and did not disclose it is, by itself, not enough to draw the inference that the Trust intended to defraud Mr. Marcantel. The Federal Circuit Court of Appeals, for example, in a slightly different context made clear that inferring deceptive intent is appropriate only where it is the "single most reasonable inference" that may be drawn from any nondisclosure:

> While deceptive intent can be inferred from indirect and circumstantial evidence, that inference must not only be based on sufficient evidence and be reasonable in light of that evidence, but it must also be the single most reasonable inference able to be drawn from the evidence to meet the clear and convincing standard. In a case involving nondisclosure of information, clear and convincing evidence must show that the applicant *made a deliberate decision to* withhold a *known* material reference.

*Am. Calcar, Inc. v. Am. Honda Motor Co.*, 651 F.3d 1318, 1334 (Fed. Cir. 2011) (internal citations and quotation marks omitted) (emphasis in original).

The court is not persuaded that the Trust deliberately decided to withhold information about the easement for the specific purpose of deceiving Mr. Marcantel. Nor is the court convinced that an intent to defraud is the single most reasonable inference to be drawn from this circumstantial evidence. Rather, the most reasonable deduction from all of the undisputed evidence, including the fact that the Trust did not know Mr. Marcantel was unaware of the easement, is that the Trust had no intent to defraud Mr. Marcantel.

Mr. Marcantel's argument that the court should infer fraudulent intent based simply on the fact that the Trust knew about the easement and did not disclose it ignores the well-defined boundary between negligent and fraudulent nondisclosure. As *Anderson* explained:

> The essential difference between a claim for negligence, or negligent nondisclosure, and a claim for fraud, or fraudulent nondisclosure, is the mental state of the defendant that the plaintiff must establish in order to prevail. This is because fraud is an intentional tort involving a malfeasance, a positive act resulting ordinarily from a willful intent to deceive; while negligence is an unintentional tort involving strictly nonfeasance, a wrongful act resulting from inattention, but not from design.

*Anderson*, 2011 UT 66, ¶ 25 (internal citations and quotation marks omitted). That the Trust knew about the easement but did not disclose it could reflect any number of things, including inattention, or simply that the Trust didn't know Mr. Marcantel was unaware of the easement. Thus, the circumstantial evidence that the Trust knew about the easement but did not disclose it is insufficient to support the inference that the Trust operated with willful intent to deceive Mr. Marcantel.[13] On either of these two elements—duty to disclose or intent to deceive—Mr. Marcantel's claim fails.

---

[13] Mr. Marcantel asserts that other circumstantial evidence supports an inference that the Trust intended to deceive him. But what Mr. Marcantel refers to as evidence amounts to argument and unsupported allegations. For example:

- Mr. Marcantel asserts that "the Trust was not able to come up with a development option that would allow [it] to recoup its financial investment in the Property…." ECF No. 109 at 37. This assertion is not found in Mr. Marcantel's statement of "Undisputed Material Facts" or otherwise supported by reference to admissible evidence in the record.

- Mr. Marcantel states that "Saltman did not disclose the Sewer Easement (or the Survey showing the Sewer Easement) because he needed to market the Property as a high density development opportunity in order to sell it for more than $1.5 million." *Id*. This statement is likewise not supported by any reference to factual material in the record.
- Mr. Marcantel argues that the "Trust knew that its application to subdivide the Property had been denied by Park City and that it had no basis to believe or represent that three homes could be constructed on the Property." *Id*. The undisputed evidence is that the Trust stopped pursuing its subdivision application not because it was denied by Park City but because the recession made development of the Property infeasible. See ECF No. 113 at 8-9. Further, the Trust had a basis to believe that three homes could be built on the Property. It is undisputed that EWA proposed just such a design concept in March 2010. ECF No. 105 at 5. Finally, the Trust did not "represent that three homes could be constructed on the Property." Mr. Marcantel is referring to the "Potential Site Plan" and Matt Magnotta's representation to Tisha Digman. The Potential Site Plan makes no representation of any kind. *Id*. at 20-21. And the record demonstrates that Mr. Magnotta simply offered his personal view regarding what he "thought could be built" on the Property. ECF No. 112 at 20, n. 23. Mr. Magnotta's personal view, even if considered a representation of fact, is not evidence of the Trust's intent to deceive. *See Helf v. Chevron U.S.A. Inc.,* 2015 UT 81, ¶ 28, 361 P.3d 63 ("[F]or the purposes of proving that a corporation is liable for an intentional tort, a plaintiff must prove that at least one agent of the corporation had all of the requisite knowledge to support the claim.").
- Mr. Marcantel points out that the Trust's real estate agents received a copy of Mr. Marcantel's title commitment, which did not identify the sewer easement. Mr. Marcantel has not shown, however, that the Trust's agents reviewed the title commitment and recognized that it omitted the easement. ECF No. 112 at 4. Mr. Marcantel notes that the Trust's title policy also did not identify the sewer easement. It is undisputed, however, that the Trust did not know its 2007 policy omitted the easement. *Id*. Citing *McBroom v. Child*, 2016 UT 38, 392 P.3d 835, Mr. Marcantel argues that the "title policy is a contract which the Trust is a party to, and the Trust is charged with knowledge of the contents therein." ECF No. 109 at 38. *McBroom* did not concern a title policy and, in any event, a party must sign an agreement before she is charged with knowledge of its contents. *McBroom*, 2016 UT 38, ¶ 24 ("Ms. Immelt signed the 1973 Agreement. Therefore, she is charged with knowledge of its contents under the law….") Mr. Marcantel offered no evidence that the Trust signed the title policy.
- Mr. Marcantel asserts that the "Trust chose not to identify its actual knowledge of the Sewer Easement, or to disclose the existence of or produce the Survey…." ECF No. 109 at 39. The undisputed evidence is that the Trust made no such choice; it simply did not occur to the Trust to disclose the easement, in part because the Trust did not know that Mr. Marcantel was unaware of the easement. ECF No. 105 at 7 & 17; ECF No. 113 at 14-15. Regarding the survey commissioned by the Trust's predecessor, Old Town Partners ("the OTP Survey") the undisputed facts are that the Trust did not have a copy to produce. ECF No. 113 at 17-18. Further, the Trust had no actual knowledge of its existence—a required element of Mr. Marcantel's fraudulent nondisclosure claim. *Id*.; *see Anderson v. Kriser*, 2011 UT 66, ¶ 29, 266 P.3d 819 (holding Utah law requires proof "by clear and convincing evidence that the defendant had *actual* knowledge of the information that the defendant failed to disclose."). The fact that an agent of the Trust saw the OTP survey eight years ealier is not sufficient as a matter of law to establish that the Trust had intent to deceive. *See Helf,* 2015 UT 81, ¶ 28 ("[F]or the purposes of proving that a corporation is liable for an intentional tort, a plaintiff must prove that at least one agent of the corporation had all of the requisite knowledge to support the claim.")

## 2. Trust did not have a duty to disclose the easement because Mr. Marcantel already had constructive notice of it as a matter of law.

Mr. Marcantel's nondisclosure claim fails, as discussed, because Mr. Marcantel has not established by clear and convincing evidence that the Trust had a duty to disclose or intent to deceive. The nondisclosure claim alternatively fails for a more fundamental reason: Mr. Marcantel already had constructive notice of the easement.

In Utah, any recorded document "shall, from the time of recording with the appropriate county recorder, impart notice to all persons of [its] contents." Utah Code §57-3-102(1). Mr. Marcantel does not dispute that the easement has been recorded since 1989. Rather, he argues it was difficult to find because it had a metes and bounds legal description, rather than a description that refers to parcel or tax serial numbers. Application of the Utah recording statute, however, is not dependent on how easily the recorded document is located. Further, it does not require parcel or tax serial numbers for recording. Rather, it requires only "a legal description of the real property," which the recording in this case satisfies. *Id.* at §57-3-105(2).

Mr. Marcantel raises two other points regarding section 57-3-102(1). First, citing *Pierucci v. Pierucci*, 2014 UT App 163, ¶ 20, 331 P.3d 7, he argues the general purpose of the recording statutes—"to protect the purchaser by enabling him to avoid unrecorded competing claims to the property he purchased in good faith…."[14]—should govern interpretation of section 57-3-102(1). But the law is clear that "we look first to the plain language of the statute" for evidence of the legislature's intent. *Savely v. Utah Highway Patrol*, 2018 UT 44, ¶ 25, 427 P.3d 1174. "Where statutory language is plain and unambiguous, this Court will not look beyond the same to divine legislative intent." *Id.* The language of section 57-3-102(1) is plain and unambiguous.

Further, even if legislative purpose were relevant, Mr. Marcantel misconstrues the purposes behind Utah's recording statutes. As explained by *Pierucci*, those purposes are to "impede fraud,

---

[14] ECF No. 111 at 18.

to foster the alienability of real property, and to provide predictability and integrity in real estate transactions." *Pierucci*, 2014 UT App 163, ¶ 20, (quoting *Federal Deposit Ins. Corp.,* 2011 UT App 416, ¶ 23, 267 P.3d 949). None of these purposes are offended by applying section 57-3-102(1) as written to conclude Mr. Marcantel had notice of the recorded easement.[15]

Mr. Marcantel also argues the easement was not "properly" recorded because, according to Mr. Marcantel, "it was posted to the wrong block by the Summit County Recorder's Office."[16] This statement, however, is merely an explanation from Coalition Title about why it missed the easement, and says nothing about whether it was "properly" recorded. More importantly, even if this was an indication the easement was not properly recorded, the outcome mandated by law does not change. Though the Supreme Court in dicta has stated that "the recording statute provides that constructive notice is imparted when documents are properly recorded," *Johnson v. Higley*, 1999 UT App 278, ¶ 24, 989 P.2d 61, the court in that case did not address what is "proper," and the statue requires only a correct "legal description of the real property." Utah Code §57-3-105(2).

Here there is no dispute that the legal description of the easement was correct.[17] And, as noted, a correct "legal description of the real property" is the only document recording requirement under the statute. Utah Code §57-3-105(2). Accordingly, regardless of whether the easement was "posted" where it belongs, it was recorded with the correct legal description of the

---

[15] Moreover, *Pierucci* is not on point. There, the court noted the specific rule that "[t]he recording of a forged deed gives no notice to the world or to anybody within it of the contents thereof" because "[s]uch a deed is void." *Id*. at ¶ 19 (quoting *Rasmussen v. Olsen*, 583 P.2d 50, 52-53 (Utah 1978)). There is no claim in this case that the recorded document creating the easement was forged or is otherwise void.

[16] ECF No. 111 at 20.

[17] For this reason, Mr. Marcantel's reliance on *In re Hiseman* is also misplaced. 440 B.R. 251 (Bankr. D. Utah 2005). The deed in that case "contained an incorrect description of the property." *Id*. at 254. "While the street address and the tax serial number of the property were correctly identified on the Trust Deed, both the Township and the metes and bounds descriptions were incorrect." *Id*.

real property covered by the easement. The law is clear: unless forged, a recorded document with a correct legal description—like the easement here—imparts constructive notice as a matter of law. And because Mr. Marcantel had notice of the easement, it cannot be deemed "latent" or "undiscoverable," as required to trigger a duty to separately disclose it to him. *See, generally, Salzman v. Bowen*, No. 2:07-CV-854 CW, 2010 WL 129798, at *6 (D. Utah Jan. 8, 2010) (noting that the plaintiff must "submit evidence to allow a reasonable jury to find that each of the alleged defects were latent" before a duty to disclose can arise).

Mr. Marcantel does not dispute this conclusion. But he does argue for a blanket exception for fraudulent nondisclosure claims. The cases on which Mr. Marcantel relies are inapposite. Specifically, these cases suggest that constructive notice provided by a recording statute will not defeat a claim for fraud or *affirmative* misrepresentation. *See Helfrich v. Adams*, 2013 UT App 37, ¶ 11, 299 P.3d 2; *Christenson v. Commonwealth Land Title Ins. Co.,* 666 P.2d 302, 307 (Utah 1983). The cases, however, say nothing of fraudulent *non*disclosure. Because fraudulent nondisclosure (unlike affirmative fraud) requires a duty to disclose, and because a duty to disclose is premised on unawareness by the receiving party, whether the receiving party had constructive knowledge is indeed relevant, and defeats Mr. Marcantel's claims in this case.

**3. Mr. Marcantel has not shown the Trust fraudulently failed to disclose the survey.**

Mr. Marcantel asserts that the Trust fraudulently failed to disclose the survey "that shows the Sewer Easement"—the survey commissioned by the Trust's predecessor, Old Town Partners ("the OTP Survey").[18] This part of the fraudulent nondisclosure claim focuses on a different source of information regarding the easement. But the material fact Mr. Marcantel claims was withheld when the survey was not disclosed is not the existence of the survey but the existence

---

[18] ECF No. 109 at 36; *see* ECF No. 89, Third Amended Complaint, at ¶ 133.

of the easement. For this reason, the court's conclusions regarding nondisclosure of the easement detailed above apply to the OTP survey as well.

### a. Mr. Marcantel has not supplied clear and convincing proof that the Trust intended to deceive him by not disclosing the OTP survey.

The fraudulent nondisclosure claim based on the OTP survey fails for another reason. It is undisputed that the trustee who handled the transaction for the Trust, Mr. Saltman, had no knowledge of the survey.[19] Without such knowledge, Mr. Saltman could not have intended to deceive Mr. Marcantel about the existence of the survey.

Mr. Marcantel argues that other agents of the Trust— particularly Jeff Werbelow—had knowledge of the survey and that knowledge should be imputed to the Trust based on the rule that a "principal is affected with constructive knowledge, regardless of actual knowledge or notice, of material facts acquired by the agent, even if the agent does not in fact inform the principal of the facts." ECF No. 111 at 25.

This is an incomplete statement of the law. Materiality is required at two levels: only a material fact is imputed, as Mr. Marcantel acknowledges, and the fact is imputed only if it's material to the agent's duties to the principal. *See Restatement (Third) of Agency* § 5.03 (2006) (agent's knowledge of a fact "is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal....") (cited in *Lane v. Provo Rehabilitation and Nursing*, 2018 UT App 10, ¶ 27, 414 P.3d 991). In addition, Mr. Werbelow's awareness of the survey, even if

---

[19] ECF No. 105 at 13. Mr. Marcantel quotes testimony from Craig Elliott's deposition that, according to Mr. Marcantel, supports an inference that Mr. Saltman had the survey when the Trust purchased the property. *See* ECF No. 111 at 12-13. The Trust objected to the cited testimony because it lacks foundation. ECF No. 112 at 10-11. The court agrees that there is no evidence Mr. Elliott knows whether Mr. Saltman was aware of the OTP survey, or had a copy at any time. Mr. Elliott appears to be assuming certain matter in the cited testimony. Those assumptions are inadmissible and do not create an issue of fact impacting the court's summary judgment analysis. *See* Fed. R. Civ. P. 56(c)(2).

imputed to the Trust, is insufficient as a matter of law to satisfy the intent to deceive element of the fraudulent nondisclosure claim.

### (i) Materiality

It was Mr. Marcantel's burden to prove his imputed knowledge theory and he offered no evidence on either materiality requirement. He's offered no evidence that the existence of the survey was a material fact when Mr. Werbelow functioned as an agent in 2007. And he has not shown that the survey's existence was material to Mr. Werbelow's duties.

In contrast, the Trust submitted the Declaration of Jeff Werbelow, which shows the OTP survey was not important or meaningful to the Trust's plans for the Property or Mr. Werbelow's efforts to advance those plans.[20] Mr. Werbelow never had a copy of the OTP survey, did not use it in helping the Trust with the Property, and has no personal knowledge of the survey playing any role in the Trust's predevelopment planning concerning the Property.[21]

Moreover, Mr. Marcantel's concern, as framed by his claims in the case, is not that the Trust failed to disclose the OTP survey but that it failed to disclose the easement shown on the survey. The question, then, is not whether Mr. Werbelow saw the OTP survey but whether he learned that the survey showed the easement. At his deposition, Mr. Werbelow was not asked and did not testify about whether he recognized the survey showed the easement while he was working for

---

[20] *See* ECF No. 113. Mr. Marcantel objected to Mr. Werbelow's declaration, arguing he "lacks personal knowledge and competency to testify" on materiality. ECF No. 115 at 8. The court overrules the objection. The declaration establishes Mr. Werbelow's personal knowledge and competency, and it is not inconsistent with Mr. Werbelow's deposition testimony regarding the survey. The declaration notes that the survey was not important or meaningful to the Trust's plans for the Property or Mr. Werbelow's efforts to advance those plans, that Mr. Werbelow never had a copy of the survey, and that he didn't use it in helping the Trust with the property. *See* ECF No. 113 at ¶¶ 4-6. Mr. Marcantel's counsel did not ask any questions on these topics during Mr. Werbelow's deposition. *See* ECF No. 105, Ex. 7 at 20:25 – 22:21.
[21] *Id*. at ¶ 5.

the Trust.[22] And the Trust established through his declaration that Mr. Werbelow did not know what is shown on the survey before Mr. Marcantel's counsel handed it to him at his deposition.[23]

### (ii) Intent to Deceive

*Wardley Better Homes & Gardens v. Cannon*, 2002 UT 99, 61 P.3d 1009, teaches that the "malice, intent, or bad faith" of a legal entity (like the Trust) "consists of the motives which prompt the action of its representatives; the requisite state of mind must necessarily be that of its employee or agent." *Id*. at ¶ 22 (*quoting* 18B Am.Jur.2d *Corporations* § 2129 (1985). The only agent of the Trust whose "motives" prompted the alleged fraudulent nondisclosure, Mr. Saltman, had no knowledge of the OTP survey. *Id*. Without that knowledge, Mr. Saltman could not have intended to deceive Mr. Marcantel about the survey. And if Mr. Saltman had no intent to deceive, the Trust could not have intended to deceive.

The fact that Mr. Werbelow saw the OTP survey is irrelevant because even if that knowledge is imputed to the Trust, it's not imputed to Mr. Saltman, the only agent of the Trust whose intent and motives matter. "[T]he requisite state of mind" was that of Mr. Saltman, the only agent of the Trust who allegedly misrepresented or fraudulently concealed the existence of the survey, and without knowledge of the survey, "the motives which prompt[ed] the action of" Mr. Saltman could not have been deceptive. *Id*.

Citing *Wardley*, Mr. Marcantel argues that the "Trust's knowledge is the sum of the knowledge of its agents and principals," presumably suggesting that the collective knowledge of Mr. Werbelow, Mr. Saltman and others doing work for the Trust at various times should be combined to support the conclusion that the Trust intended to deceive by not disclosing the existence of the survey. Mr. Marcantel's "sum of the knowledge" argument was rejected by the Utah Supreme Court in *Helf v. Chevron U.S.A. Inc.,* 2015 UT 81, 361 P.3d 63:

---
[22] ECF No. 112 at 12.
[23] ECF No. 113 at ¶ 6.

> Although it may be possible that the collective knowledge of the agents of a corporation may be relevant in other legal contexts, *see* Restatement (Third) of Agency § 5.03 cmt.c (2006), we agree that for the purposes of proving that a corporation is liable for an intentional tort, a plaintiff must prove that at least one agent of the corporation had all of the requisite knowledge to support the claim. Inventing a corporate consciousness with the capacity to possess the state of mind necessary for an intentional tort is inconsistent with the principles of tort law. *See Adams,* 508 N.W.2d at 480. Therefore, the district court correctly concluded that at least one Chevron agent must have all of the knowledge necessary to support liability under an intentional tort theory.

*Id*. at ¶ 28. In short, Mr. Marcantel does not establish fraudulent intent by demonstrating that various Trust agents were aware of the OTP survey.

When all undisputed facts are considered, it's plain that Mr. Marcantel has not demonstrated by clear and convincing evidence that the Trust had the fraudulent mental state needed to support a fraudulent nondisclosure claim.

## C. Mr. Marcantel's fraudulent misrepresentation claim fails on the merits.

In addition to his claim for fraudulent omission, Mr. Marcantel also asserts that the Trust made several fraudulent misrepresentations. To succeed on this claim, Mr. Marcantel must establish:

> (1) that a representation was made (2) concerning a presently existing material fact (3) which was false and (4) which the representor either (a) knew to be false or (b) made recklessly, knowing that there was insufficient knowledge upon which to base such a representation, (5) for the purpose of inducing the other party to act upon it and (6) that the other party, acting reasonably and in ignorance of its falsity, (7) did in fact rely upon it (8) and was thereby induced to act (9) to that party's injury and damage.

*Cardon v. Jean Brown Research*, 2014 UT App 35, ¶ 6, 327 P.3d 22. According to Mr. Marcantel, the Trust's misrepresentations are contained in three documents: the MLS listing for the Property, a "Potential Site Plan" EWA prepared in 2007, and the Seller's Property Disclosure form ("the Disclosure Form") provided by the Trust. Mr. Marcantel has not, however, shown that representations in any of these three documents amount to fraudulent misrepresentations.

### 1. The MLS listing

The first alleged misrepresentation is in the MLS listing, which Mr. Marcantel describes as "advertis[ing] the Property as having development potential for up to five residential units."[24] Mr. Marcantel argues this representation was false because "the Saltmans' architect informed them that without a code change and the approval of the Sewer District, that density simply wasn't 'feasible.'"[25] This part of Mr. Marcantel's fraud claim fails because the alleged misrepresentation is not of a presently existing material fact, it's not false, there is no evidence of intent to deceive, and Mr. Marcantel did not rely on the alleged misrepresentation.

### a. No false representation.

First, Mr. Marcantel has not established that the MSL listing contained a false representation. The listing stated that the Property "may be able to accommodate up to 5 residential units," and Mr. Marcantel contends that statement is false for two reasons: (a) that EWA had previously informed the Trust "that any more than two units on a single property is penalized under Park City's development code (60% open space, set backs, parking) and buildings are restricted to two stories (27' height) and **is not feasible**"; and that (b) "when Sara Werbelow and EWA met with Park City Planners to discuss high-density development for four to five townhomes, the City's feedback was discouraging and in line with EWA's opinion of non-feasibility."[26]

Neither of these points negates or even concerns the MLS listing. EWA's advice that the City's development code may penalize more than two units on a single property had nothing to do with accommodating five residential units. Rather, this statement came in an email exchange in 2010, five years before the MLS listing, and concerned a concept plan for two lots with a

---

[24] ECF No. 89 at ¶ 149.
[25] *Id*. at 150.
[26] ECF No. 111 at 35-36 (emphasis Marcantel's).

duplex on one and a single-family residence on the other.[27] In response to that concept plan, the Trust asked: "And, if we went for a variance and more density as an elderly care facility…. In that case, overall gross building square footage potential?"[28] It was in response to that question, not a query regarding "five residential units," that Mr. Elliott responded: "Currently, there is no way supported in the code to gain a significant amount of density. All sections give lip service to the idea, but in reality are not feasible." *Id.*

This 2010 response to the Trust's question about density potential does not prove false the 2015 statement that the Property "may be able to accommodate up to 5 residential units." In fact, more than two years after that 2010 response, EWA proposed a 5 residential unit plan for the Property with the sewer line in place.[29] Mr. Marcantel's reference to Mr. Elliott's 2010 email does not show that the 2015 statement was false.

Mr. Marcantel also asserts that the statement in the MLS listing was false because "when Sara Werbelow and EWA met with Park City Planners to discuss high-density development for four to five townhomes, the City's feedback was discouraging and in line with EWA's opinion of non-feasibility."[30] But this misconstrues the record. As noted, it's undisputed that EWA proposed a five-townhouse plan for the Property in November 2012.[31] The email cited by Mr. Marcantel, in which EWA's Roger Durst and Ms. Werbelow discussed input from Park City, was exchanged in September and October 2012, before EWA proposed its five-townhouse plan.[32] There is no evidence that Park City ever provided input—discouraging or not—concerning the November 2012 design.[33] Finally, Mr. Marcantel's conclusion that Park City's

---

[27] *See* ECF No. 109, Ex.25-001 to 003.
[28] Ex.25-001.
[29] *See* ECF No. 105 at 6; *see* ECF No. 105, Appendix Ex. 4, Elliott Depo., at 90-92.
[30] ECF No. 111 at 36.
[31] *Id.*
[32] *See* ECF No. 112 at 3.
[33] *Id.*

input involved "non-compliance with the code" is also not supported by the email, which mentions only that Park City identified "issues" with setbacks and height.[34] This is not the clear and convincing evidence required to establish that the MLS listing was false.

### b. No fraudulent intent.

Even if Mr. Marcantel could show the MLS listing was false, he has not demonstrated it was made with intent to deceive. As noted in connection with the nondisclosure claim, "intent is the hallmark of an intentional tort" and the intentional tort of fraud requires proof by clear and convincing evidence of the defendant's intent to deceive. *Anderson*, 2011 UT 66, ¶ 26. Mr. Marcantel does not directly address this requirement in connection with the MLS listing, but instead argues generally that the Trust could have "listed the Property for sale without making any representations concerning how it could be developed," and speculates that the Trust instead "intentionally crafted" an "illusion" regarding the Property being "a high density development opportunity…."[35]

In short, Mr. Marcantel asks the court to infer fraudulent intent. "While the intent to deceive may be inferred, it must be established by more than doubtful, vague, speculative or inconclusive evidence." *Andalex Res., Inc. v. Myers*, 871 P.2d 1041, 1047 (Utah Ct. App. 1994)(internal citation omitted). Mr. Marcantel's speculation about the Trust's motives does not meet his burden of proving fraudulent intent by clear and convincing evidence.

### c. No reliance.

Finally, even assuming the MLS listing was otherwise false and done with fraudulent intent, Mr. Marcantel failed to demonstrate he relied on it, and in fact suggested the opposite. During his deposition, for example, Mr. Marcantel stated that he didn't "necessarily" believe the reference to five residential units in the MLS listing. As he put it, "that's just somebody saying you could put

---

[34] *Id.*; *see* ECF No. 109, Ex. 25-017.
[35] *Marcantel's Opposition* at 37.

five units in there."[36]

The MLS listing, however, did not state that a buyer "could put five units in there." Instead, it stated that the Property "may be able to accommodate up to 5 residential units."[37] And the very next sentence advises prospective buyers to "consult with your architect" about developing the Property.[38] Finally, the MLS listing includes this express disclaimer:

> Seller and Seller's agent have done limited investigation into what is allowed or can feasibly be done on this parcel. Buyer and Buyer's agent are encouraged to consult qualified professionals and the Town of Park City prior to making any assumptions [about] value or development opportunities on this parcel.[39]

Mr. Marcantel does not directly address this evidence. He generally asserts that he "relied on the Trust's representations and decided to purchase the Property," but offers no evidence or argument demonstrating reliance on the MLS listing.[40]

The undisputed facts show Mr. Marcantel did not rely on the MLS listing, nor could he have given its express disclaimers. Accordingly, Mr. Marcantel has not met his burden to establish reliance by clear and convincing evidence and this part of his fraud claim fails as a matter of law.

## 2. The "Potential Site Plan"

Mr. Marcantel also contends that the Trust made affirmative misrepresentations in a "Potential Site Plan" contained in a digital Dropbox file the Trust's realtor offered Mr. Marcantel's realtors. According to Mr. Marcantel, the Potential Site Plan "represented that the Property could be subdivided into three buildable lots," and Mr. Marcantel contends this representation was false because the Trust "had attempted to subdivide and develop the Property in accordance with the Potential Site Plan but found it impossible due to the presence of the

---

[36] ECF No. 105, Appendix Ex. 9, *Marcantel Depo.,* at 42-43.
[37] ECF No. 105, Appendix Ex. 12.
[38] *Id.*
[39] *Id.*
[40] ECF No. 111 at 37.

Sewer Easement."[41] This claim fails because the Potential Site Plan makes no representation as such; it makes no representation of an existing fact; it contains no false representation; it was not offered with intent to deceive; and, in any event, Mr. Marcantel did not rely on anything stated in the Potential Site Plan.

First, the Potential Site Plan makes no representation that the Property could be subdivided into three buildable lots. It is a series drawings created by EWA, each of which is dated April 30, 2007 and labelled "HDDR Review," which, Mr. Marcantel knew, meant that they were created eight years earlier for Park City's Historic District Design Review ("HDDR") process, one step in a multistep process for plan approval. The Potential Site Plan says nothing about whether the Trust completed the HDDR process or, if so, the end result. It does not state or even imply that Park City would approve subdivision and development of the Property in the manner depicted. And it makes no other representation about the Property's development potential, particularly not the development potential in 2015.

Second, the Potential Site Plan makes no representation of an existing fact. By definition, a "potential" site plan is not a representation of existing fact but an opinion regarding the possibility of future development approval consistent with that plan. Opinions are not actionable as fraud and, even if factual, the site plan referred to what a third-party—Park City—might do in the future. *See Nielson v. Leamington Mines & Expl. Corp.,* 87 Utah 69, 48 P.2d 439 (1935) (holding a statement that third parties would supply money to develop property was in the nature of an opinion predicting future conduct and, therefore, not fraudulent).

Third, even if the Potential Site Plan made a representation of an existing fact, it was not a false representation. Mr. Marcantel's counter is based on the following argument:

> The Trust …had no reason to believe that the Property could lawfully be
> subdivided and developed as three homes, specifically as depicted in the

---

[41] ECF No. 89 at ¶¶ 151-152. Appendix Ex. 1.

> Potential Site Plan, due to the undisclosed Sewer Easement. The "best" that EWA
> could come up with as far as subdividing the Property in a manner that would not
> require relocating the Sewer Easement was for two lots….[42]

The Trust acknowledges that it applied to subdivide the Property consistent with the Potential Site Plan, and stopped pursuing that application in late 2007. But the undisputed evidence shows the reason the Trust didn't complete the application process was the recession that started about that time, which made development of the Property infeasible.[43] In other words, the recession, not the sewer easement, stopped the Trust's development work.

Moreover, Mr. Marcantel has not shown that relocating the easement was a prerequisite to building three homes on the Property. In contrast, the Trust offered undisputed evidence that in 2010, Mr. Elliott produced a design concept that has three homes on three lots and he explained how that concept could work with the easement in place.[44] Even if relocating the easement was required, Mr. Marcantel has not shown that doing so was impossible. The Potential Site Plan contemplated moving the easement to the rear of the property and an effort to do just that was underway in 2007. The recession stopped that effort but Mr. Marcantel has not shown that it would have failed had it continued. Without that proof, Mr. Marcantel's argument regarding the false nature of the Potential Site Plan fails for lack of factual support.

Fourth, Mr. Marcantel has not demonstrated any representation in the Potential Site Plan was made with fraudulent intent. As is true of the MLS listing, Mr. Marcantel does not directly address the fraudulent intent requirement in connection with the Potential Site Plan. Again, he argues generally that the Trust's fraudulent intent should be inferred from what he refers to as the "illusion" of a "high density development opportunity" created by the Trust.[45] At best, however, the evidence Mr. Marcantel offers to support his "illusion" theory is speculative and inconclusive

---

[42] ECF No. 111 at 35.
[43] ECF No. 105, Appendix Ex. 3, Saltman Depo. at 45 & 51.
[44] *See* ECF No. 112 at 4; *see* ECF No. 105, App. Ex. 4, *Elliott Depo.,* at 69:16-71:17.
[45] See ECF No. 111 at 37.

and insufficient to allow the court to draw an inference of intent to deceive. *See Andalex Res., Inc.*, 871 P.2d at 1047. Mr. Marcantel's speculation about the Trust's motives does not meet his burden to demonstrate fraudulent intent by clear and convincing evidence.

Finally, the undisputed facts show Mr. Marcantel did not in fact rely on the Potential Site Plan. When questioned about it at his deposition, Mr. Marcantel said it was not important to him because he had no plans for developing the Property.[46] Mr. Marcantel did explain that the Property's development *potential* was important to him. But he understood that potential was a function of what Park City might approve in 2015, not what was shown on an eight year old Potential Site Plan.[47] That is, Mr. Marcantel understood he had to independently verify the Property's development potential. Mr. Marcantel had his realtors meet with Park City for that purpose.[48] One result of that meeting was confirmation that the 2015 Park City development codes may not allow what was depicted on the 2007 potential site plan.[49]

Mr. Marcantel had the burden to establish these elements by clear and convincing evidence. He failed to do so, and this portion of his fraud claim fails on that basis.

### 3. The Disclosure Form.

The final part of Mr. Marcantel's fraud claim concerns three alleged misrepresentations in the Disclosure Form the Trust provided. Specifically, Mr. Marcantel alleges:

- The Trust falsely stated that it was "unaware of any easements or claims of easement…."[50]
- The Trust falsely stated that it was not aware of any survey of the Property.[51]

---

[46] See ECF No. 105 at 9; Marcantel Depo. at 35-37, Appendix Ex. 9.
[47] See ECF No. 105 at 9; Appendix Ex. 9 at 39, 45-46 & 50; Appendix Ex. 11 at 81-82 & 95-100. Mr. Marcantel' realtor Cam Schiedel echoed the point, testifying that Park City's development codes changed between 2007 and 2015 and that, as a result, there was no way to know whether the 2007 Potential Site Plan could be built in 2015. *See* ECF. No. 105, App. Ex. 10 at 76:17-25.
[48] ECF No. 105, Appendix Ex. 11, Digman Depo., at 81-82 & 95-100; Appendix Ex. 9, Marcantel Depo., at 39, 45-46 & 50,.
[49] ECF No. 105, Appendix Ex. 11, Digman Depo., at 20-22; Appendix Ex. 10, Schiedel Depo., at 18-19 & 27-28.
[50] ECF No. 89 at ¶ 156, Appendix Ex. 1.
[51] *Id*. at ¶ 158, Appendix Ex. 1.

- The Trust falsely stated that the information in the Disclosure Form was "accurate and complete to the best of Seller's actual knowledge…."[52]

As explained below, Mr. Marcantel lacks evidence sufficient to establish one or more of the elements required for each of these alleged misrepresentations.

### a. Easements or claims of easements.

According to Mr. Marcantel, the Trust falsely stated it was "unaware of any easements or claims of easement."[53] The actual question in the Disclosure Form, however, is whether the Trust was "aware of any *unrecorded* easements, or claims for easements, affecting the Property."[54] The undisputed evidence shows that the Trust's "no" answer to this question was true—the Trust was not aware of any unrecorded easements.[55]

Mr. Marcantel also argues the phrase "claims for easements" means a claimed "right to an easement…."[56] Even taking this definition as correct, there is no evidence that any "claims for easements" were asserted or pending at the time and, even if they were, the Trust was not aware of them.[57] Mr. Marcantel offered no evidence to the contrary. Accordingly, Mr. Marcantel has not shown that the Trust's "no" answer to this part of the Disclosure Form was false.

Finally, even if the Trust's "no" answer was false, Mr. Marcantel has not shown fraudulent intent in connection with the answer. In fact, Mr. Marcantel fails to address this essential element of his fraud claim. For any of these reasons, this part of the claim fails as a matter of law.

### b. Survey.

Mr. Marcantel next contends that the Trust falsely stated in the Disclosure Form that it was not "aware of any survey(s) that [had] been prepared for the Property…."[58] This claim

---

[52] *Id*. at ¶ 160, Appendix Ex. 1.
[53] ECF No. 89 at ¶ 156, Appendix Ex. 1.
[54] ECF No. 105, Appendix Ex. 17, *Disclosure Form* at § 6.E. (emphasis added).
[55] ECF No. 105, Appendix Ex. 3, Saltman Depo. at 80; Appendix Ex. 6, Saltman Dec. at ¶ 9.
[56] ECF No. 111 at 24.
[57] ECF No. 105, Appendix Ex. 6, Saltman Dec. at ¶ 9.
[58] ECF No. 105, Appendix Ex. 17, *Disclosure Form* at § 6.D.

fails because Mr. Marcantel has not demonstrated: (a) the representation was false; (b) it was material; (c) it was done with intent to deceive; or (d) it caused him any harm.

### (i) The representation was not false.

First, Mr. Marcantel has not demonstrated the representation in the Disclosure Form that the Trust was not aware of any surveys was false. The survey at issue was commissioned by Old Town Partners ("OTP"), the prior owner of the Property.[59] OTP had been working with EWA to prepare development concepts for the Property and, in that context, OTP engaged Alliance Engineering to prepare the survey in November 2006.[60] OTP sold the Property to the Trust in February 2007.[61]

Mr. Marcantel's argument that the representation in the Disclosure Form was false is based on the fact that the OTP survey eventually ended up in the files of the Park City Planning Department in connection with a 2007 HDDR process requested by the Trust, along with Mr. Marcantel's assumption that the Trust supplied that survey, or was otherwise aware of its existence.[62] But there is no evidence supporting either assumption. The only evidence in the record addressing the matter establishes that EWA submitted the OTP survey to Park City on April 30, 2007, with other HDDR materials.[63]

Indeed, the evidence demonstrates that Mr. Saltman, the trustee handling the sale for the Trust, had no knowledge of any survey of the Property when he signed the Disclosure Form on February 8, 2015, verifying that the information contained in the document was "accurate and complete to the best of Seller's actual knowledge as of the date signed by Seller below." ECF

---

[59] ECF No. 105, a copy of the Survey is included in the Appendix at Ex. 15.
[60] *Id*.; Elliott Depo. at 18-20, Appendix Ex. 4; S. Werbelow Depo. at 38-39, Appendix Ex. 8.
[61] ECF No. 89 at ¶¶ 10 & 13, Appendix Ex. 1.
[62] *Id*. at ¶ 21, Appendix Ex. 1.
[63] ECF No. 105, Appendix Ex. 4, Elliott Depo. at 62-64; *see* April 30, 2007 transmittal letter from Elliott Workgroup to the Park City Planning Department, copy of which is included in the Appendix at Ex. 16.

No. 105, *Disclosure Form* at 4, Appendix Ex. 17.[64] In fact, just one day earlier, on February 7, 2015, the Trust's realtor Matt Magnotta emailed Mr. Saltman noting that the "Buyer is asking for a survey if one has been done." Mr. Saltman responded:

> No survey in my files.
>
> Please check with Steve Bruemmer—Elliott Workgroup Architects—to see if he or they have one. I don't think so but worth inquiring as we have worked on various preliminary development ideas from time to time.

*Saltman Dec*. at Exhibit A, Appendix Ex. 6.[65] Mr. Magnotta contacted EWA and learned that everything it had was accessible through a Dropbox link forwarded to Mr. Magnotta a week or so earlier.[66] The materials accessible through that Dropbox link did not include a survey.[67]

---

[64] ECF No. 105, Saltman Depo at 70 and 77-79, Appendix Ex. 3

[65] The court notes that Mr. Saltman copied both of Mr. Marcantel's realtors (through whom Mr. Marcantel had all communications with the Trust) on this email to Mr. Magnotta. It is reasonable to conclude that if Mr. Saltman had intended to conceal the existence of the OTP survey, he would not have provided Mr. Marcantel's realtors with information regarding a possible source of the survey. *See* ECF No. 105 at 23-25.

[66] See ECF No. 113, Ex. 65 at ¶¶ 5-6.

[67] *Id*. Mr. Marcantel objected to Mr. Magnotta's declaration, arguing that paragraph 5 of the declaration is inadmissible because it contains hearsay and "does not satisfy the standard of personal knowledge required by Rule 56(c)(4)." ECF No. 115 at 11. The court overrules the objection. Paragraph 5 of the declaration states: "To the best of my recollection, I contacted Mr. Bruemmer and asked whether he or [EWA] had a survey of the Property, and he stated that he had given us everything they had via a Dropbox link sent by email on January 30, 2015." Mr. Bruemmer's statement is not hearsay because the Trust is not offering it for the truth of the matter stated. Establishing that EWA in fact supplied everything it had via the Dropbox link is not the purpose of paragraph 5. Instead, the purpose is to demonstrate the effect the statement had on the Trust, which checked the Dropbox link and did not find a survey of the Property.

Mr. Marcantel's argument regarding the personal knowledge standard is based on the fact that Mr. Magnotta starts paragraph 5 with the statement "to the best of my recollection." Citing *Pace v. Capobianco*, 283 F.3d 1275 (11th Cir. 2002), Mr. Marcantel argues this statement "implies that Magnotta is not willing to testify that the communication actually occurred…." *Pace* is not on point.  It dealt with an affiant who referred to what he "believe[d]," not one who referred to his "best recollection." *Id*. at 1278-1279. The only arguably on point authority Mr. Marcantel cites is a footnote in an order from the Northern District of Florida, *Wills v. Potter*, No. 4:05CV381-WS, 2008 WL 821921, at *11 (N.D. Fla. Mar. 27, 2008), *aff'd sub nom. Wills v. Postmaster Gen.*, 300 F. App'x 748 (11th Cir. 2008). The footnote does not cite authority for the judge's conclusion.

As he did in connection with his fraudulent nondisclosure claim, Mr. Marcantel argues that Jeff Werbelow had knowledge of the survey and, as an agent, his knowledge should be imputed to the Trust based on the rule that a "principal is affected with constructive knowledge, regardless of actual knowledge or notice, of material facts acquired by the agent, even if the agent does not in fact inform the principal of the facts."[68] But as explained in connection with that claim, only material facts are imputed, and then only if the facts are material to the agent's duties to the principal. *See Restatement (Third) of Agency* § 5.03 (2006) (agent's knowledge of a fact "is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal....") (cited in *Lane v. Provo Rehabilitation and Nursing*, 2018 UT App 10, ¶ 27, 414 P.3d 991). It was Mr. Marcantel's burden to prove his imputed knowledge theory, and he offered no evidence on either materiality requirement.

In contrast, the Trust submitted the Declaration of Jeff Werbelow, which demonstrates the OTP survey was not important or meaningful to the Trust's plans for the Property or Mr. Werbelow's efforts to advance those plans.[69] Mr. Werbelow never had a copy of the OTP survey, did not use it in helping the Trust with the Property, and has no personal knowledge of the survey playing any role in the Trust's predevelopment planning concerning the Property.[70] Moreover, Mr. Marcantel's concern, as framed by his claims in the case, is not that the Trust failed to disclose the OTP survey but that it failed to disclose the easement shown on the survey. The question, then, is not whether Mr. Werbelow saw the OTP survey but whether he learned that the survey showed the easement. The only evidence in the record addressing that question establishes that Mr. Werbelow did not know what the survey showed until it was handed to him at his deposition.[71]

---

[68] ECF No. 111 at 25.
[69] ECF No. 113 at ¶ 4.
[70] *Id*. at ¶ 5.
[71] *Id*. at ¶ 6.

In short, the Trust's statement that it was not "aware of any survey(s) that [had] been prepared for the Property" was true.[72] Mr. Marcantel speculates otherwise, but speculation doesn't meet the heavy evidentiary burden he faces.

**(ii) The representation was not material.**

Even if the representation in the Disclosure Form was false, Mr. Marcantel has not demonstrated it is material. Only material facts can be the subject of a fraud claim. *See Cardon*, 2014 UT App 35, ¶ 6. The existence of a survey, however, was not material in the context of this transaction.

Mr. Marcantel notes that the OTP survey showed the easement but, of course, he didn't know that when he purchased the Property. The issue is whether the "existence or nonexistence" of a survey is something a reasonable person would attach importance to "in determining his choice of action in the transaction in question." Restatement (Second) of Torts § 538 (1977); *see Walter v. Stewart*, 2003 UT App 86, ¶ 23, 67 P.3d 1042 ("A material fact is any fact, the knowledge or ignorance of which would naturally influence [a party's] judgment ...in estimating the degree and character of the risk" involved in a transaction.) (internal quotation marks omitted). Because Mr. Marcantel did not know what the OTP survey revealed, its existence or nonexistence could not have been a factor in his decision to purchase the Property and, therefore, was not material to Mr. Marcantel at the time.

**(iii) No intent to deceive.**

Further, Mr. Marcantel has not demonstrated any intent to deceive. It is undisputed that the trustee who handled the transaction for the Trust, Mr. Saltman, had no knowledge of the survey.[73] And without such knowledge, Mr. Saltman could not have intended to deceive Mr. Marcantel about the existence of the OTP survey.

---

[72] ECF No. 105, Appendix Ex. 17, *Disclosure Form* at § 6.D.
[73] ECF No. 105 at 13.

Mr. Marcantel argues that the Trust had Jeff Werbelow's imputed knowledge of the OTP survey and that, with this knowledge, the intent to deceive may by inferred from the Trust's Disclosure Form statement that it was not aware of any survey. But as explained in connection with the nondisclosure claim, this imputed knowledge theory fails. Mr. Werbelow's awareness of the OTP survey, even if imputed to the Trust, is insufficient as a matter of law to satisfy the intent to deceive element. As explained by the Restatement (Third) Of Agency § 5.03 (2006):

> Particular legal consequences may depend on a combination of knowledge or reason to know a fact, plus a specific intention. For example, a claim of fraud may require that a person who misstated a material fact has made the misstatement intending to defraud the person to whom the statement was made. If so, a principal may not be subject to liability for fraud if one agent makes a statement, believing it to be true, while another agent knows facts that falsify the other agent's statement. Although notice is imputed to the principal of the facts known by the knowledgeable agent, the agent who made the false statement did not do so intending to defraud the person to whom the statement was made.

*See also Help v. Chevron U.S.A. Inc.,* 2015 UT 81, ¶ 28, 361 P.3d 63 ("Although it may be possible that the collective knowledge of the agents of a corporation may be relevant in other legal contexts, *see* Restatement (Third) of Agency § 5.03 cmt.c (2006), we agree that for the purposes of proving that a corporation is liable for an intentional tort, a plaintiff must prove that at least one agent of the corporation had all of the requisite knowledge to support the claim.").

In short, Mr. Marcantel does not establish fraudulent intent by demonstrating that various Trust agents were aware of the OTP survey. He must show that the agent who allegedly made the false statement, Mr. Saltman, did so intending to defraud him. And he must make the showing by clear and convincing evidence. Mr. Marcantel has not met this burden.

### (iv) The alleged misrepresentation was not the cause of any loss.

Finally, Mr. Marcantel has not demonstrated the representation caused him any loss. The causation element of a fraud claim has two components: causation in fact and legal causation. *See* Restatement (Second) of Torts §§ 546 and 548A (1977); *see also United States v. Johnson,*

No. 2:09-CR-00133-003-CW, 2014 WL 11461054, at *8 (D. Utah Mar. 31, 2014). Concerning causation in fact, the Restatement notes:

> The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss suffered by one who justifiably relies upon the truth of the matter misrepresented, if his reliance is a substantial factor in determining the course of conduct that results in his loss.

Restatement (Second) of Torts § 546. Focusing on the second part of this standard, Mr. Marcantel has not established that his alleged reliance on the Trust's "no" answer to the survey question in the Disclosure Form was "a substantial factor" in his decision to purchase the Property. Indeed, as explained in connection with the materiality element, the existence of a survey was inconsequential. Mr. Marcantel did not know what the OTP survey revealed. For that reason alone, its existence or nonexistence could not have been a factor, and certainly not a substantial factor, in his purchase decision.

In sum, when the Trust verified to the best of its actual knowledge that it was not aware of any survey of the Property, its answer was true. To the extent Mr. Marcantel's arguments to the contrary have any support in the record, they are not supported by the clear and convincing evidence required of Mr. Marcantel. Even if they were, however, this part of Marcantel's fraud claim fails for lack of materiality, fraudulent intent and causation in fact.

### c. Other answers in the Disclosure Form

Mr. Marcantel's final grievance regarding the Disclosure Form is that the Trust "did not accurately or completely represent [its] knowledge of the Property" because it did not disclose the "existence, nature, or approximate location of the Sewer Easement."[74] By signing the form, however, the Trust did not verify it had completely represented its knowledge of the Property. Rather, it verified "that the information contained [in the form] is accurate and complete to the

---

[74] ECF No. 89 at ¶¶ 161 and 162, Appendix Ex. 1.

best of [the Trust's] actual knowledge as of the date signed by [the Trust] below."[75] Indeed, the Trust had no duty under the Disclosure Form to explain to Mr. Marcantel everything it knew of the Property. Specifically, regarding easements, the Trust's only obligation was to answer this question: "Are you aware of any unrecorded easements, or claims for easements, affecting the Property?"[76] The Trust satisfied its obligation by answering the question, and its "no" answer as both accurate and complete. This final part of Marcantel's fraud claim fails as a matter of law.[77]

**II. The Trust did not breach the REPC.**

Mr. Marcantel alleges the Trust breached the REPC "by failing to disclose the Sewer Easement …and failing to produce surveys and other documents in [its] possession depicting the same." *Compl.* at ¶ 175, Appendix Ex. 1. Mr. Marcantel asserts that these obligations arise from the Disclosure Form and from sections 7(h) and 10.2 of the REPC.

Mr. Marcantel misreads the Disclosure Form and REPC. The Disclosure Form creates no contract duties other than the duty, imposed by the REPC, to answer the questions posed in the form and return the form by the agreed deadline. Also, the REPC sections at issue impose no obligation to disclose the easement or produce documents depicting the easement. Accordingly, the Trust fully complied with its obligations under the REPC.

**A. The Trust complied with its obligations regarding the Disclosure Form.**

Mr. Marcantel argues the Disclosure Form imposed on the Trust an obligation "to disclose its actual knowledge concerning the Sewer Easement on the Property…."[78] The argument is

---

[75] ECF No. 105, Appendix Ex. 17, *Disclosure Form* at 4.
[76] *Id.* at § 6.E., Appendix Ex. 17.
[77] Marcantel used his opposing memorandum to argue, for the first time, that the Trust's realtor, Matt Magnotta, fraudulently "represented to Tisha Digman that three single-family homes can be constructed on the Property…." ECF No. 111 at 33. The Trust objected to Marcantel's effort to amend his fraud claim post discovery. This new fraud claim is not properly before the court. Even if the court were inclined to consider it, however, the court is persuaded by the Trust's arguments about why the claim fails as a matter of law. *See* ECF No. 112 at 20, n. 23.
[78] ECF No. 109 at 23.

based on this sentence from the instructions on the first page of the Disclosure Form: "Please thoroughly disclose your actual knowledge regarding the condition of the Property."[79] This language does not create a contractual obligation. It merely recites Utah law on a seller's obligation to disclose property defects, as explained in the language immediately preceding the language Mr. Marcantel relies on:

> SELLER IS OBLIGATED UNDER LAW TO DISCLOSE TO BUYERS DEFECTS IN THE PROPERTY KNOWN TO SELLER THAT MATERIALLY AND ADVERSELY AFFECT THE VALUE OF THE PROPERTY THAT CANNOT BE DISCOVERED BY A REASONABLE INSPECTION BY AN ORDINARY PRUDENT BUYER. This disclosure form is designed to assist Seller in complying with these disclosure requirements.

ECF No. 105, Appendix Ex. 17, *Disclosure Form* at 1.

Regarding easements on the Property, the Trust's obligation was to answer this question at section 6.E. of the Disclosure Form: "Are you aware of any unrecorded easements, or claims for easements, affecting the Property?"[80] It is undisputed that the Trust answered the question and returned the completed form to Mr. Marcantel by the agreed deadline. Whether the Trust answered the question honestly is an issue addressed in connection with Mr. Marcantel's fraud-based claims. By answering the question and returning the form, the Trust satisfied its contract-based obligations.

Mr. Marcantel also argues the Disclosure Form obligated the Trust "to disclose its existing knowledge of the Survey."[81] Again, regarding surveys, the Trust's contractual obligation was to answer this Disclosure Form question: "Are you aware of any survey(s) that have been prepared for the Property or any adjoining property or properties? If Yes, please provide a copy of any such survey(s) in your possession."[82] There is no dispute about the fact that the Trust answered

---

[79] ECF No. 105, Appendix Ex. 17, *Disclosure Form* at 1.
[80] *Id.* at § 6.E.
[81] ECF No. 109 at 27.
[82] ECF No. 105, Appendix Ex. 17 at § 6D.

the question and timely returned the completed form to Mr. Marcantel. In doing so, the Trust satisfied this part of its contractual obligation.

**B. The Trust complied with its obligations under REPC section 7(h).**

Under section 7(h), the Trust agreed to provide a "survey if one has been done."[83] Mr. Marcantel argues REPC section 7(h) required the Trust to determine if a survey of the Property existed and, if so, to produce that survey. But this argument misconstrues the language of section 7(h), which only required the Trust to produce a survey if it had one or, at most, if one had been produced for it.[84]

**1. The Trust did not have a survey.**

The undisputed facts are that the Trust didn't have a survey and didn't know if one existed. This part of Mr. Marcantel's contract claim hinges on his theory that by agreeing to provide a "survey if one has been done," the Trust agreed to "affirmatively …determine whether the [OTP] Survey existed."[85]

The REPC imposes no such duty and Mr. Marcantel has not cited authority suggesting any other basis for the duty. The Trust determined that the only possible source it was aware of, EWA, did not have a survey.[86] In doing so, the Trust fully satisfied its obligations under section 7(h).

This is a matter of contract interpretation and the starting point is the contract language viewed in the overall context of the transaction. That context includes the fact that the parties agreed to close the deal quickly. They agreed to complete the entire transaction in 21 business

---

[83] ECF No. 105, Appendix Ex. 5.
[84] The Trust also argued that the merger doctrine applies to render REPC section 7(h) extinguished and unenforceable. In light of its conclusion that the Trust did not breach section 7(h), the court does not address this issue.
[85] ECF No. 109 at 28.
[86] See Ex. 65 at ¶¶ 5- 6.

days.[87] And the Trust's "Seller Disclosures" (including a survey if one had been done) were due

just three days after the parties reached agreement.[88] The Trust had between Friday, February 6

and Monday, February 9, to collect and provide these documents to Mr. Marcantel:

> a. A written Seller Property Condition Disclosure for the Property.
> b. A commitment for title insurance.
> c. A copy of any restrictive covenants, rules and regulations affecting the Property.
> d. A copy of the most recent minutes, budget and financial statement for any homeowners association.
> e. A copy of any lease, rental or management agreement affecting the Property.
> f. Evidence of any water rights and water shares for the Property.
> g. Written notice of any claims and conditions known to the Trust relating to environmental problems and any violation of CC&Rs, federal, state or local laws, and building or zoning code violations.
> h. A survey if one had been done.

ECF No. 105, Ex. 5 at § 7.

Mr. Marcantel's interpretation is that over the weekend of February 6, in addition to

collecting and supplying all of the listed documents, the Trust had to "affirmatively …determine

whether the Survey existed," get a copy if it found one and deliver that copy to Mr. Marcantel.[89]

In support of his interpretation, Mr. Marcantel argues it's "undisputed that the Survey existed,

that it had been previously used in the Trust's applications to Park City, [and] that Jeff Werbelow

had seen the Survey…."[90]

---

[87] See ECF No. 105, Ex. 5 at p. 6.

[88] *Id*.

[89] *Marcantel's Motion* at 28.

[90] *Id*. Mr. Marcantel also argues it's undisputed "that both Alliance and EWA (hired to perform services on behalf of the Trust) had the Survey in their possession." ECF No. 109 at 28. The Trust responded by noting Alliance and EWA may have had a copy of the OTP survey when asked to respond to Marcantel's subpoenas in 2017 but there is no evidence that they had a copy on February 9, 2015, the Trust's seller disclosures deadline. Mr. Marcantel calls this point "absurd," noting that EWA found a copy of the OTP survey in response to Karin Tritt Ross' request "in the fall of 2015." ECF No. 115 at 20, n. 33. Mr. Marcantel forgets, however, that on February 7, 2015, the Trust's realtor Matt Magnotta asked EWA if it had a survey and its response was that it had provided everything it had via the Dropbox link forwarded to Mr. Magnotta on January 30, 2015. *See* ECF No. 113, Ex. 65 at ¶¶ 5-6. The materials accessible through that Dropbox link did not include a survey. *Id*. Accordingly, there is no evidence in the record that EWA had a copy of the OTP survey as of the seller disclosures deadline.

For purposes of interpreting the REPC language, the relevant question is not what's known now, after more than two years of discovery, but what the parties knew in February 2015, when they agreed to the REPC terms. There is no evidence that in February 2015 either party knew that a survey existed, that one had been used in applications to Park City submitted by EWA or that Jeff Werbelow had seen one.[91] Accordingly, it's not reasonable to interpret the requirement to provide a survey "if one has been done" as requiring the Trust to affirmatively determine whether a survey ever existed. Making that determination would have required learning the identity of every living owner of the Property, finding and making contact with those owners, and getting a copy of any survey, all within 72 hours over a weekend. Mr. Marcantel could not have intended his six word addition to REPC section 7 to require that of the Trust, and the Trust did not read it that way.

Given the facts and circumstances at the time, the only reasonable interpretation is the Trust was obligated to provide a survey if one had been done by or for the Trust. Consistent with that interpretation, the Trust confirmed that it had no survey in its files and asked its realtor Matt Magnotta to check with EWA, who had worked with the Trust to explore development options in the past. Mr. Magnotta contacted EWA and was told that everything it had was accessible through a Dropbox link forwarded to Mr. Magnotta a week or so earlier.[92] The materials accessible through that Dropbox link did not include a survey.[93]

---

[91] Mr. Marcantel argues that the Trust constructively knew Mr. Werbelow had seen the OTP survey. However, as noted in connection with the nondisclosure claim, Mr. Marcantel has not met his burden to prove his imputed knowledge theory because he offered no evidence establishing that the existence of the survey was a material fact when Mr. Werbelow functioned as an agent in 2007, and he did not show that the survey's existence was material to Mr. Werbelow's duties. In any event, the issue is how the Trust interpreted the language Mr. Marcantel added to section 7(h) of the REPC and only actual, not imputed, knowledge could have played a role in that interpretation.

[92] See ECF No. 113 at ¶¶ 5-6.

[93] *Id*.

In short, section 7(h) of the REPC required the Trust to produce a survey of the Property

if it had one or if it could locate one. It is undisputed that the Trust did not have a survey and

was unable to locate one despite contacting the only possible source it was aware of, EWA.

Accordingly, the Trust fully satisfied its obligations under section 7(h).

**C. The Trust complied with its obligations under REPC section 10.2.**

REPC section 10.2 required disclosure of "defects in the Property known to Seller that

materially affect the value of the Property that cannot be discovered by a reasonable inspection

by an ordinary prudent Buyer…."[94] The court concludes that the sewer easement constitutes

a defect in the Property. The court also concludes, however, that section 10.2 did not require

the Trust to disclose the easement because the Trust had no reason to believe the easement was

undiscoverable, and Marcantel already had notice of the easement as a matter of law.

**1. The easement is a defect in the Property.**

The threshold requirement for disclosure under section 10.2 is a defect in the Property

known to the Trust. The court interprets the REPC according to the ordinary meaning of its

terms. *See Mind & Motion Utah Investments, LLC*, 2016 UT 6, ¶ 24, 367 P.3d 994.

The Trust asserts that a "defect" is an "imperfection or shortcoming…." Black's Law

Dictionary (Rev. 7th ed. 1999). It argues that the easement was a factor that had to be addressed

in developing the Property but was not an imperfection or shortcoming in the Property itself.

The Trust points out that section 10.2 expressly limits the disclosure requirement to the "physical

condition of the property" and argues that the easement is not a physical condition but a property

right or legal condition.[95]

---

[94] ECF No. 105, Ex. 5 at §10.2.

[95] *Id*.

Mr. Marcantel argues that the easement constituted a defect because it had "both legal and physical impacts" on the Property.[96] He points out that "an easement cannot be built over and must be built around, impacting building placement and possibly the density…."[97] He also notes that the easement is a "physical condition of the property" because it concerns the sewer line buried in the Property.

Under the specific facts and circumstances of this case, the court agrees with Mr. Marcantel that the easement is a defect. In reaching this conclusion, the court does not conclude that an easement is always a defect in the real property subject to the easement. But in this case, for the reasons articulated by Mr. Marcantel, the easement was a defect for purposes of section 10.2 of the REPC.[98]

## 2. The Trust had no reason to believe the easement was undiscoverable.

Although the easement was a defect in the Property, the Trust had no reason to believe the easement could not be discovered by a reasonable inspection—a condition precedent to its disclosure obligation. The Trust learned about the easement when the seller, OTP, asked for help in an effort to shift the easement toward the rear of the Property.[99] The Trust had no reason to question how the easement was recorded or whether it was, as Mr. Marcantel claims, a "rogue" easement.[100] In short, the Trust simply didn't know Marcantel was acting under a misapprehension concerning the existence of the easement. The section 10.2 obligation

---

[96] ECF No. 115 at 17.

[97] *Id*.

[98] Citing the language of section 10.2, the Trust also argues that section 10.2 requires proof that the Trust knew the easement was a defect in the Property, and points out that the evidence is to the contrary. Mr. Marcantel counters that the Trust's knowledge in this regard is irrelevant because whether something is a defect is an objective question. The court agrees with Mr. Marcantel.

[99] ECF No. 105, Appendix Ex. 6, Saltman Dec. at ¶ 8; Appendix Ex. 7, J. Werbelow Depo.at 10; Appendix Ex. 8, S. Werbelow Depo.at 14 & 40-44.

[100] ECF No. 89 at ¶ 9, Appendix Ex. 1.

to disclose was never triggered because the Trust had no reason to believe the easement was undiscoverable through reasonable inspection.

### 3. Marcantel already had notice of the easement as a matter of law.

Even if the Trust's disclosure obligation was otherwise triggered, the Trust had no obligation to disclose the easemment because Mr. Marcantel already had notice of the easement as a matter of law. As explained, "each document executed, acknowledged, and certified, in the manner prescribed by [title 57 of the Utah Code] shall, from the time of recording with the appropriate county recorder, impart notice to all persons of their contents." Utah Code §57-3-102(1)(2000). It is undisputed that the easement meets the requirements of section 57-3-102(1).

The statute makes no exceptions for matters of record that could be characterized as defects. For that reason, Mr. Marcantel is deemed to have had notice of the easement and the Trust had no obligation under section 10.2 to again give him notice of it.

Mr. Marcantel's only response—that "constructive record notice is …not relevant to the analysis of whether the Trust satisfied contractual obligations"—is unsupported by authority or analysis.[101] The court finds Mr. Marcantel's response unpersuasive. Mr. Marcantel had notice of the easement as a matter of law. Under these circumstances, the Trust had no obligation under section 10.2 to disclose the easement.

## III. The Trust did not breach the implied covenant of good faith and fair dealing.

Mr. Marcantel asserts that the Trust breached the implied covenant of good faith and fair dealing "by concealing and failing to disclose the Sewer Easement…." [102] Under the covenant of good faith and fair dealing, each party to a contract "impliedly promises that he will not intentionally or purposely do anything which will destroy or injure the other party's right to

---

[101] *Marcantel's Reply* at 17, n. 28. Mr. Marcantel certainly believed constructive notice was relevant to the Trust's contract obligations when arguing Mr. Werbelow's awareness of the OTP survey should be imputed to the Trust. *See* Marcantel's Motion at 26-27.
[102] ECF No. 89 at ¶ 181.

receive the fruits of the contract." *Hays v. Park City Sch. Dist.* 2016 U.S. Dist. LEXIS 136417

*39 (D. Utah Sept. 30, 2016) (*citing St. Benedict's Dev. Co. v. St. Benedict's Hosp.,* 811 P.2d

194, 199) (Utah 1991)). To prevail, a plaintiff must show "an intentional effort to injure the other

party's right to receive the benefits of the contract.... The covenant, however, does not establish

new rights and duties to which the parties did not agree." *Schmitt v. Stearns Lending, Inc.,* 2011

U.S. Dist. LEXIS 98868 * 6 (D. Utah Aug. 31, 2011) (*citing Simplot v. Chevron Pipeline

Co.,* 563 F.3d 1102, 1113) (10th Cir. 2009).

Mr. Marcantel alleges that the Trust knew his "purpose in purchasing the Property was to

subdivide and re-sell the Property as three buildable lots" and the Trust "impaired" that purpose

by not telling him that its "prior attempts to subdivide the Property failed as a result of the

Sewer Easement."[103] However, the undisputed facts show that the Trust could not have known

Mr. Marcantel's plan "was to subdivide and re-sell the Property as three buildable lots" because

he had no such plan. Mr. Marcantel was clear in his deposition testimony that he "had no plans"

for the Property when he bought it.[104] When asked specifically whether the EWA drawing

showing the Property divided into three lots was important to him, Mr. Marcantel answered:

"Not really because I had no intention of what I was going to do with the property."[105]

Even if Mr. Marcantel did have a plan for the Property when he bought it, he has offered no

evidence that the Trust knew that plan. Only Mr. Marcantel's realtors communicated with the

Trust and the only testimony from his realtors about plans for the Property concerns meetings

with the Park City Planning Department staff, where "development opportunities" were

discussed.[106] If Mr. Marcantel had a purpose in purchasing the Property, he never revealed it to

the Trust.

---

[103] *Id.* at ¶¶ 183-185.
[104] ECF No. 105, Appendix Ex. 9 at 35-36.
[105] *Id.* at 37, Appendix Ex. 9.
[106] ECF No. 105, Appendix Ex.10, *Schiedel Depo.* at 27-28.

Mr. Marcantel's assertion that the Trust impaired his purpose in buying the Property by not disclosing that "prior attempts to subdivide the Property failed as a result of the Sewer Easement" is likewise unsupported by evidence.[107] As noted, Mr. Marcantel had no specific purpose in buying the Property. And there is no evidence that the Trust's efforts to subdivide the Property failed. Instead, the undisputed facts show that the Trust decided to stop trying to subdivide when the recession started.[108] That decision was not the result of the Sewer Easement but a function of the fact that the recession made development of the Property infeasible. The Trust is entitled to summary judgment on the claim for breach of the implied covenant of good faith and fair dealing.

## ORDER

ACCORDINGLY, IT IS HEREBY ORDERED that Plaintiff Curt A. Marcantel's Motion for Partial Summary Judgment is DENIED and Defendants Michael and Sonja Saltman Family Trust, Michael A. Saltman and Sonja Saltman's Motion for Summary judgment is GRANTED. Judgment shall be entered in favor of Defendants.

DATED this 19th day of March, 2019.

BY THE COURT:

_____
Dustin B. Pead
United States Magistrate Judge

---

[107] ECF No. 89 at ¶ 184, Appendix Ex. 1.
[108] ECF No. 105, Appendix Ex. 3, Saltman Depo. at 45 & 51.